IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
IN RE:                          )
                                )
TORIANO J. AVERY,               )
                                )
     Debtor,                    )
                                )
TORIANO J. AVERY,               )
                                )
     Appellant,                 )
                                )
     v.                         )       CIVIL ACTION NO.
                                )       3:09cv138-MHT
WELLS FARGO BANK, NATIONAL      )          (WO)
ASSOCIATION, d/b/a Wells        )
Fargo Home Mortgage,            )
Inc.,                           )
                                )
     Appellees.                 )
```

## OPINION

Appellant Toriano J. Avery initiated an adversary proceeding against appellee Wells Fargo Bank, National Association, in the United States Bankruptcy Court for the Middle District of Alabama, claiming violations of federal and state law.  The bankruptcy court subsequently granted Wells Fargo's motion for summary judgment with prejudice.  The matter is now before the court on Avery's

appeal from the summary-judgment decision of the bankruptcy court. The court's appellate jurisdiction has been properly invoked pursuant to 28 U.S.C. § 158(a). After oral argument and for the reasons that follow, the court will affirm in part and reverse in part.

## I. STANDARD OF REVIEW

"In reviewing bankruptcy court judgments, a district court functions as an appellate court." In re JLJ, Inc., 988 F.2d 1112, 1116 (11th Cir. 1993). The court's review of a bankruptcy court's entry of summary judgment is entirely de novo. In re Optical Techs., Inc., 246 F.3d 1332, 1335 (11th Cir. 2001).

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Fed. R. Bankr. P. 7056 (applying Fed. R. Civ. P. 56 to adversary proceedings). In conducting its analysis, the

2

court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

On April 7, 2006, Avery filed a voluntary Chapter 13 petition and plan with the bankruptcy court.  Her plan was confirmed four months later, on August 7.

At the time Avery's Chapter 13 plan was confirmed, her residence was subject to a mortgage held by Washington Mutual Bank ("WaMu").  She had defaulted on that mortgage prior to her petition and was $ 7,848 in arrears.  Pursuant to her plan, Avery was to cure this pre-petition arrearage through monthly payments.  She was also to continue making her contractual monthly direct mortgage payments to WaMu.

Following confirmation of her Chapter 13 plan, Avery continued to fail to make her direct mortgage payments.

3

Due to these failures, WaMu twice filed motions for relief from the automatic stay.  In response to each motion, and upon agreement between WaMu and Avery, the bankruptcy court modified the Chapter 13 plan to cure her post-petition arrearage.  <u>See</u> Def.'s Ex. F (Doc. No. 2-18) & Def.'s Ex. I (Doc. No. 2-21).[1]

The first order modifying the plan was issued by the bankruptcy court on October 4, 2006.  This order amended the plan to 'cure' missed direct mortgage payments of $ 679.70 for each of August and September 2006, late charges of $ 22.96 for each of July, August, and September 2006, and attorney's fees related to the motion for relief from the automatic stay.  Despite this cure, Wells Fargo's records indicate that a late fee of $ 22.96, which was assessed to Avery's account on

---

1.  "[A} confirmed Chapter 13 plan may be modified to allow the Debtor to cure a postconfirmation default pursuant to [11 U.S.C.] § 1322(b)(5) with the postconfirmation arrearage to be paid under the modified plan."  <u>In re Hoggle</u>, 12 F.3d 1008, 1012 (11th Cir. 1994).

September 18, 2006, remained in her outstanding fee balance after the October 4 order.[2]

The second order modifying the plan was issued by the bankruptcy court on January 17, 2007. This order amended the plan to cure missed direct mortgage payments for October, November, and December 2006, late charges of $ 22.96 for each of those months, and attorney's fees related to the motion for relief from the automatic stay. Once again, despite the cure, Wells Fargo's records indicate that Avery's outstanding fee balance on January 22, 2007, was $ 98.88. This amount is the sum of the above-discussed September 18 late fee, late fees of $ 22.96 assessed on October 16 and November 16, and a $ 30.00 fee (presumably a returned item fee for a check returned for insufficient funds) assessed on December 26.

---

2. All references to Wells Fargo's records in this opinion are to a spreadsheet prepared by Beverly DeCaro, a Default Litigation Specialist for Wells Fargo. See Ex. 1 to Def.'s Ex. G (Doc. 2-20).

Wells Fargo's records also indicate that, as of January 22, $ 436.06 was being held in "debtor suspense."[3]

The January 17 order also "conditionally denied" the motion for relief from the automatic stay.  However, it went on to state: "[S]hould the Debtor fail to make any payment within thirty days from its due date beginning January, 2007, the Motion for Relief from Stay is granted without further order of the Court. ... Waiver of default shall not constitute waiver of subsequent default." Def.'s Ex. I.[4]

Prior to the January 17 order, WaMu transferred the servicing of Avery's mortgage to Wells Fargo.  Avery was

_____

3.   The records indicate that Avery made a partial payment of $ 435.46 on December 4, 2006.  Each of her payments to Wells Fargo was apparently held in a so-called "debtor suspense" account before it was applied to her mortgage or fees.

4.   Avery's mortgage also indicates that, "If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events." Pl.'s Ex. A at ¶ 9 (Doc. No. 2-26).

served notice of the transfer on December 11, 2006, and was instructed that the "Chapter 13 Trustee payments and regular monthly payments should be sent to Wells Fargo Bank." Pl.'s Ex. I (Doc. 2-26).

On January 30, 2007, Avery made a post-petition payment of $ 680.00 to Wells Fargo. She made another $ 680.00 payment on February 26. Because she overpaid by $ .30 each month, her debtor suspense balance had increased to $ 436.66 by March.

On March 15, she made a partial payment of $ 490.00. Wells Fargo's records indicate that this amount was added to her debtor suspense balance, resulting in a total of $ 926.66. However, she was not credited for a March payment at this time. A late fee of $ 22.96 was assessed to her account on March 16.[5]

_____

5.   Avery's mortgage note authorizes a late fee, "If the lender has not received the full monthly payment required ... by the end of fifteen calendar days after payment is due." Pl.'s Ex. B at ¶ 6 (Doc. No. 2-26).

7

On April 3, Avery sent Wells Fargo a check for $ 700.00, but on April 10 the instrument was returned for insufficient funds.  On April 13, she sent another check for $ 430.00, but on April 16, this check too was returned for insufficient funds.  Avery made partial payments of $ 100.00, $ 200.00, $ 200.00 and $ 330.00 on April 23, May 3, May 15, and May 16 respectively. According to Wells Fargo, "On or about May 16, 2007, [Avery] had enough credit in her account to satisfy the March post petition payment, therefore Wells Fargo credited [Avery] for the March post petition payment." Def.'s Br. at 6 (Doc. No. 2-12).  On that date, Wells Fargo's records indicate that she had a debtor suspense balance of $ 826.96.  The records also show that she was assessed late fees of $ 22.96 for each of April and May.

On May 22, Wells Fargo sent Avery a letter stating that she was in "post-petition default on [her] direct mortgage payments."  Pl.'s Ex. L (Doc. No. 2-32). According to the letter, she owed "2 payments of $ 679.70

each for 04/07 and 05/07"; "2 late charges of $ 22.96 each for 04/07 and 05/07"; and, "Attorney Fees [of $ 50.00] for filing Notice of Default." Id. The letter noted that she had $ 390.00 in "Debtor Suspense," and thus that she owed a total of $ 1,064.42. Wells Fargo's records, however, indicate that on May 21 she had a debtor suspense of $ 826.96. After sending the May 22 letter, Wells Fargo discovered that Avery's May 15 check for $ 200.00 and her May 16 check for $ 330.00 had been returned for insufficient funds.[6]

On June 14, Wells Fargo received a wire transfer from Avery in the amount of $ 1,064.00, nearly the "total due" as indicated in the May 22 letter. Nonetheless, on June 22, 2007, Wells Fargo sent Avery a letter indicating that she was in default for "4 payments of $ 679.70 each for 03/07 through 06/07." Def.'s Ex. N (Doc. No. 2-34).

_____

6. The $ 330.00 was subtracted from her debtor suspense on May 23, resulting in a debtor suspense of $ 496.96. At no point in the month of May do Wells Fargo's records indicate that she had $ 390.00 in debtor suspense.

9

According to this letter, she owed "3 late charges of $ 22.96 each for 03/07 through 05/07" and "Attorney Fees [of $ 50.00] for filing Notice of Default." Id. The letter noted that she had a "Debtor Suspense" of $ 540.60 and thus that the total amount due was $ 2,297.08. Wells Fargo has since admitted that, "The June 22, 2007 letter did not reflect [Avery's] correct delinquency." Def.'s Br. at 8; see also Appellee's Br. at 27 (Doc. No. 14).[7] Moreover, Wells Fargo's records indicate that on June 22 Avery's debtor suspense was $ 681.26. At no point in the month of June do the records indicate that her debtor suspense dropped below this amount.

On July 6, Wells Fargo received another payment in the amount of $ 700.00. However, this payment was later returned for insufficient funds. Avery then made

---

7. Wells Fargo claims that, "The June 22, 2007 letter did not reflect [Avery's] correct delinquency due to the numerous insufficient funds checks issued by [her]." Def.'s Br. at 8. However, it also admits that on June 18, 2007, four days prior to the date on the letter, it had "credited [Avery] for her March and April 2007 post petition payments." Id.

payments of $ 900.00, $ 700.00, and $ 703.00 on July 17, August 14, and August 31 respectively.   Wells Fargo's records indicate that she was assessed late fees of $ 22.96 for each of June, July, and August.   Indeed, in July she was assessed two late fees on the same day.

At this point, a brief review of Avery's complicated 2007 payment history is helpful: She made full post-petition payments in January and February.   She then began a pattern of late payments and checks returned for insufficient funds.   However, by August 31 she had made payments of $ 490.00 (March 15), $ 100.00 (April 23), $ 200.00 (May 3), $ 1,064.00 (June 14), $ 900.00 (July 17), $ 700.00 (August 14), and $ 703.00 (August 31), for a total of $ 4,157.00.   Her total amount owed for March through August was $ 4,078.20 ($ 679.70 x 6 months).   Thus, not taking into account any fees, she was paid in full through August, with a credit of $ 78.80.[8]   If the

---

8.   Wells Fargo's records indicate that all of her late fees and insufficient funds fees were collected in
(continued...)

$ 436.66 she had in debtor suspense at the beginning of March is considered, she was fully paid through August with a credit of $ 515.46.[9]

On September 26, Wells Fargo sent Avery a third letter notifying her that she was in "post-petition default on [her] direct mortgage payments." Pl.'s Ex. M (Doc. No. 2-26). The letter indicated that she owed "2 payments of $ 679.70 each for 08/07 and 09/07"; "2 late charges of $ 22.96 each for 08/07 and 09/07"; and "Attorney Fees [of $ 50.00] for filing Notice of Default." Id. The letter noted that she had a debtor

_____

(...continued)
an "outstanding fee balance." As of August 31, her outstanding fee balance was $ 462.56. This amount appears to include the late fees assessed prior to the bankruptcy court's January 17 order.

9. Wells Fargo's records indicate that, following her $ 703.00 payment on August 31, she had a debtor suspense of $ 1,624.86. She was credited for her July payment on September 4, leaving a debtor suspense of $ 945.16. This suspense was sufficient to satisfy her August direct mortgage payment, leaving a credit of $ 265.46.

suspense of $ 509.10 and thus that the total due was
$ 946.22.

The September 26 letter is at odds with Wells Fargo's
records, which show a debtor suspense balance of $ 945.16
and no late fee assessed for September 2007.  A Wells
Fargo representative explained that the $ 509.10 figure
listed in the letter was reached by deducting Avery's
"outstanding fee balance" on that date--which was
composed entirely of late fees and returned item fees--
from her debtor suspense balance.  See Beverly DeCaro
Dep. at 83:14-84:25, Pl.'s Ex. H (Doc. No. 2-26).[10]  By
this explanation, either the September 26 letter
indicated that Wells Fargo had already collected, or the
letter was itself an attempt to collect, the entirety of
Avery's outstanding fee balance.

_____

10. It should be noted that this explanation is not
consistent with the records, which show an outstanding
fee balance of $ 462.56 throughout the month of September
($ 945.16 - $ 462.56 = $ 482.60).

13

On October 5, Avery made a final payment of $ 700.00. Wells Fargo's records show that, with that payment, her debtor suspense balance rose from $ 945.16 to $ 1,645.16. On October 8, Wells Fargo credited Avery for her August direct mortgage payment, taking $ 679.70 from her debtor suspense balance and leaving $ 965.46. Although she had sufficient funds in debtor suspense to satisfy her September payment as well, she was not credited for that payment. Her outstanding fee balance on October 8 was still $ 462.56.

On October 8, Wells Fargo's records indicate that Avery also carried an "Outstanding Corporate Advance Balance" of $ 3,488.62. This balance was composed of, among other things, property-inspection fees assessed to Avery's account and paid by Wells Fargo. Between the January 17, 2007, order and October 8, at least five inspection fees, each in the amount of $ 15.00, appear on Avery's account. According to a Wells Fargo representative, the bank charges these property-

14

inspection fees on an automatic basis following a delinquency. <u>See</u> Beverly DeCaro Dep. at 30:14-31:1. She described the inspections as follows: "Usually they just drive by the property to make sure that the house is standing, the grass is cut, anything normal that you can see that is upkeep of the house." <u>Id</u>. at 32:15-18.

On November 2, Wells Fargo sent Avery a "Notice of Acceleration of Promissory Note and Mortgage." Def.'s Ex. P (Doc. No. 2-36). This notice informed her that Wells Fargo was "commencing foreclosure under the terms of the Mortgage" and "that the foreclosure sale is scheduled for December 7, 2007." <u>Id</u>. Under the terms of her mortgage, the "Grounds for Acceleration of Debt" include the "Borrower default[ing] by failing to pay any monthly payment ... prior to or on the due date of the next monthly payment." Pl.'s Ex. A at ¶ 9. On the date of the acceleration notice, and even if any legitimate outstanding fees are not considered, Avery had made only a partial payment for the month of October.

15

On November 30, 2007, Avery filed a ten-count complaint against Wells Fargo.[11] Only seven of those counts--one, two, three, five, seven, eight, and nine--are at issue in this appeal.[12] The majority of these remaining counts allege that Wells Fargo improperly assessed fees to her account. She also claims false default, wrongful foreclosure, and violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq.

Avery admits that she "has made no further post-petition ongoing mortgage payments to Wells Fargo since the filing of the adversary proceeding." Pl.'s Br. at 5 (Doc. No. 2-24); Appellant's Br. at 15 (Doc. No. 12).

---

11. Avery's complaint also named WaMu as a defendant, but the parties later filed a joint stipulation dismissing WaMu from this adversary proceeding. See Notice (Doc. No. 2-10).

12. In her initial response to Wells Fargo's motion, Avery conceded that summary judgment was due with respect to counts four and six of her complaint. See Pl.'s Br. at 9. Count ten requested a temporary restraining order to prevent the foreclosure sale of her home.

16

Indeed, she has made no payments since October 5, 2007. She also admits that she continues to "liv[e] in the house on the property securing Wells Fargo's Mortgage ... [and that] Wells Fargo has not foreclosed on the ... home." Pl.'s Br. at 5; Appellant's Br. at 15.

Wells Fargo responded to Avery's complaint with a motion for summary judgment. It explicitly did <u>not</u> request summary judgment on count three of Avery's complaint. <u>See</u> Def.'s Reply at 7 (Doc. No. 2-27). Despite the limitations of Wells Fargo's motion, the bankruptcy court subsequently granted summary judgment on each count of Avery's complaint. Avery responded with this appeal.

### III. DISCUSSION

### A. Improper Fees

Counts one, two, five, seven, and eight of Avery's complaint rely, at least in part, on allegations that Wells Fargo charged improper fees to her mortgage account. In its motion for summary judgment, Wells Fargo

17

sought to eliminate each of these claims with the broad argument that Avery could not "present any affirmative evidence of improper charges on [her] account." Def.'s Br. at 12; see also id. at 12-15. In a three-sentence paragraph addressing the alleged improper fees, the bankruptcy court agreed, finding that Avery "did not identify even one charge that was made improperly." Bankr. Ct. Op. at 7 (Doc. No. 2-28). As should be clear from the extensive background provided above, this ruling is not consistent with the evidence.[13]

Avery does not, and cannot, contend that her Chapter 13 plan modified the right of Wells Fargo to charge and collect fees under the terms of her mortgage. See 11 U.S.C. § 1322(b)(2). Instead, she argues that Wells Fargo charged fees to her account that were not authorized by the mortgage instrument and thus violated

_____

13. The bankruptcy court's failure to identify the relevant evidence is understandable, as Avery's briefs are hardly a model of clarity. Avery's counsel is reminded that he, and not the court, bears the responsibility for identifying and presenting evidence.

18

both the terms of the mortgage and the automatic stay. In particular, she claims that Wells Fargo improperly charged late fees and property-inspection fees.

With respect to late fees, Avery has conceded that her "Mortgage and Note allow[] for the imposing of late charges." Pl.'s Br. at 7. She also "does not disagree that she made late monthly mortgage payments or that she had numerous checks returned for insufficient funds." Id. at 8. Of course, late fees may still be charged improperly.

Here, the evidence shows that multiple late fees remained on her account despite the fact that they had been cured by bankruptcy court orders amending her Chapter 13 plan. At oral argument, Wells Fargo's attorney theorized that these fees may have been shifted into Avery's Chapter 13 plan even though they still appeared in the "outstanding fee balance" column of the account records, but she offered nothing from the record to support this theory.

19

Wells Fargo's records, which show that hundreds of dollars were kept in a debtor suspense account throughout 2007, also raise questions about the appropriateness of other late fees. For example, Avery apparently had $ 926.66 in debtor suspense in mid-March, but was not credited for her $ 679.70 March payment at that time. She was assessed a late fee on March 16.

Finally, there is the mysterious double late fee assessed on July 16, 2007. Wells Fargo's attorney tried to resolve this mystery at oral argument, but, once again, she could produce no record evidence to support her explanation.

In contrast to her concessions regarding late fees, Avery has consistently maintained that neither her mortgage nor the associated note authorizes Wells Fargo to assess property-inspection fees. It is undisputed that such fees appear on her account.

Wells Fargo responds that, "to the extent [it] charged [Avery] expenses for property inspections in this

case, such charges were valid and authorized under the term[s] of the mortgage." Def.'s Reply at 6; see also Appellee's Br. at 22. Wells Fargo notes that paragraph five of the mortgage instrument states that, "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default ... [and] Lender may take reasonable action to protect and preserve such vacant or abandoned property." Def.'s Ex. A (Doc. No. 2-13). But it relies primarily on paragraph seven of the mortgage, which is titled, "Charges to Borrower and Protection of Lender's Rights in the Property." Id. This paragraph states, in part, that,

> "If Borrower fails to make the[] payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including

> payment of taxes, hazard insurance and
> other items mentioned in paragraph 2."

Id. (emphasis added); see Def.'s Reply at 5; Appellee's

Br. at 21.

The bankruptcy court did not address whether the

provisions cited by Wells Fargo authorize the assessment

of property-inspection fees.   Moreover, even if the

provisions are so-construed--and it is far from clear

that they should be--questions would remain about the

manner and particular circumstances in which such fees

were assessed in this case.   Interpreting a similar

provision, the Bankruptcy Court for the Eastern District

of Pennsylvania reasonably observed that,

> "There may be circumstances in which
> obtaining an inspection of a mortgaged
> property is 'necessary' to protect a
> mortgage lender's interest in the
> property secured by the mortgage.   For
> example, if a lender has reason to
> believe that a borrower has vacated or
> abandoned the property, the lender may
> wish to take action to secure the
> property. Or, if a lender has reason to
> believe that a borrower is laying waste
> to a property, the lender may need to
> seek some type of emergency judicial

22

> relief.  In situations such as these, an
> inspection may be needed to aid the
> lender in determining whether it should
> take action to protect its interest in
> the property (and, if so, what action to
> take).  At the same time, however, the
> mere fact that a mortgage loan is
> delinquent, by itself, does not
> establish the necessity for property
> inspections at the borrower's expense
> under Paragraph 7.  The core requirement
> in Paragraph 7 is that the expenditure
> must be 'necessary' to protect the
> lender's interest."

In re Sacko, 394 B.R. 90, 105 (Bankr. E. D. Pa. 2008)

(Frank, B.J.).  In that case, the bankruptcy court

ultimately found that the mortgage holder offered no

evidence "to explain why the inspections were necessary"

and disallowed claimed fees for said inspections.  Id. at

105-06.

As noted above, Avery has offered evidence that Wells

Fargo charges a property-inspection fee on an automatic

basis following a delinquency.  See Beverly DeCaro Dep.

at 30:14-31:1.  And a Wells Fargo representative

described the property inspections as "[u]sually ... just

[a] drive by the property to make sure that the house is

23

standing, the grass is cut, anything normal that you can see that is upkeep of the house."   <u>Id</u>. at 32:15-18. Given this description, and the admittedly automatic nature of the inspections, Avery has, at the very least, raised questions of fact regarding the "necessity" of the property-inspection fees assessed to her account.

For these reasons,[14] Wells Fargo's broad argument that it "is entitled to a summary judgment because [Avery] cannot present any affirmative evidence of improper charges on [her] account," def.'s br. at 2, should have been, and now will be, rejected.[15]

## B.  False Default

Counts one, two, and eight of Avery's complaint rely, at least in part, on allegations that the assessment of

_____

14. The court need not, and thus does not, reach Avery's other potentially meritorious arguments that fees were improperly assessed to her account.

15. It is noteworthy that Wells Fargo raised no other arguments for summary judgment with respect to counts five and seven.

unauthorized fees to her account created a "false default." Wells Fargo argues that summary judgment is appropriate with respect to these claims because, setting aside any fees assessed to her account, Avery was in default when it sent notice of acceleration. The bankruptcy court agreed, stating that, "The evidence is clear in this case that [Avery] repeatedly defaulted on [her] mortgage, either by not making payments or by tendering checks which were dishonored." Bankr. Ct. Op. at 6.

As discussed in detail above, the record shows that Avery was in default for at least the month of October 2007 when Wells Fargo mailed its notice of acceleration. Indeed, Avery's attorney conceded as much at oral argument. Thus, default was caused, not by the assessment of improper fees, but by Avery's failure to make timely and full direct mortgage payments.[16] For this

---

16. A failure, it should be noted, that was repeated throughout 2007.

reason, summary judgment is due with respect to Avery's false-default claims.

## C.  Wrongful Foreclosure

Count nine of Avery's complaint asserts that Wells Fargo wrongfully instituted a foreclosure proceeding against her.  But as discussed above, Avery was in default at the time Wells Fargo notified her of its intention to initiate foreclosure proceedings, thus foreclosure was authorized under the terms of her mortgage.[17]

And Avery is in no position to argue that the notice of acceleration was in violation of the automatic stay. The bankruptcy court's January 17, 2007, order explicitly stated that, "should [Avery] fail to make any payment within thirty days from its due date beginning January,

---

17. Although not relevant to the question of summary judgment, the court also notes that it is abundantly clear that Avery is currently in default, as she has not made a mortgage payment since filing the instant complaint.

2007, the Motion for Relief from Stay is granted without further order of the Court." Def.'s Ex. I.  The evidence shows that Avery's October direct mortgage payment was at least 30 days delinquent on the date that the notice of acceleration was sent to her.

For these reasons, summary judgment was due with respect to Avery's wrongful-foreclosure claim.

### D.  Violations of the FDCPA

Count three of Avery's complaint asserts violations of the Fair Debt Collection Practices Act.  Even a cursory review of the record in this case shows that Wells Fargo did not move for summary judgment on count three.  Indeed, Wells Fargo explicitly stated that it "did not include the FDCPA claim in [its] Motion for Summary Judgment, because [it] believes there is an issue of fact as it relates to Count 3." Def.'s Reply at 7.

It is well-established that trial courts "may properly grant summary judgment sua sponte, so long as the parties have been provided adequate notice." Cox

27

_Nuclear Pharm., Inc. v. CTI, Inc._, 478 F.3d 1303, 1312 (11th Cir. 2007).  Indeed, the Eleventh Circuit Court of Appeals has "upheld a sua sponte grant of summary judgment where 'the district court had no formal motion for summary judgment on the [claims at issue] before it, and did not formally notify [the plaintiff] that it was considering [those claims] in the summary judgment proceedings.'"  _Id_. at 1313 (citing _Artistic Entm't, Inc. v. City of Warner Robins_, 331 F.3d 1196, 1202 (11th Cir. 2003)).  In that case, however, the appellate court "held that summary judgment was appropriate because 'the dismissed claims [had] been fully developed in the evidentiary record and the non-moving party [had] received adequate notice.'"  _Id_. at 1313 (citing _Artistic Entm't_, 331 F.3d at 1202).

In this case, the court cannot conclude that Avery had adequate notice of the bankruptcy court's intention to address her FDCPA claims on summary judgment.  This is due, in part, to the court's own difficulty in discerning

28

the basis upon which the bankruptcy court dismissed the claims.[18]  Indeed, there is not a single reference to the FDCPA in the bankruptcy court's short opinion.

It also appears to the court that summary judgment is inappropriate with respect to this count.  On appeal, Avery clarifies the nature of her FDCPA claim, arguing that Wells Fargo "caused to be delivered to [her] ... two notices of default and demands for payment which contained inaccurate statements with respect to [her] mortgage account." Appellant's Br. at 45.  Specifically, she points to Wells Fargo's letters dated June 22 and September 26.

Under the FDCPA, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."   15

_____

18. Avery was clearly confused by the bankruptcy court's decision.  See Appellant's Br. at 48 ("Because the Bankruptcy court's decision is devoid of legal authority for its decision to grant summary judgment on Toriano Avery's FDCPA claims ... [she] is left to argue any possible basis for the ... decision.").

U.S.C. § 1692e.  Among the conduct expressly prohibited by the statute is, "The false representation of ... the character, amount, or legal status of any debt." § 1692e(2)(A).  "The FDCPA is a strict liability statute."  Carn v. Med. Data Sys., 379 B.R. 371, 374 (M.D. Ala. 2007) (Albritton, J.) (citing Bentley v. Great Lakes Collection Bureau, 6 F.3d 60, 63 (2nd Cir. 1993)). And "a single violation of § 1692e is sufficient to establish civil liability."  Id. (citing 15 U.S.C. § 1692k).

As discussed in detail above, there are questions of fact regarding the accuracy of the information contained in both the June 22 and September 26 letters.  Indeed, Wells Fargo "acknowledge[s] that the ... Notice of Default Letter on June 22, 2007, was an inaccurate statement of [Avery's] account."  Appellee's Br. at 27. And the information in the September 26 letter is not consistent with Wells Fargo's own records.

Nonetheless, Wells Fargo argues for the first time on appeal that summary judgment is appropriate with respect to Avery's FDCPA claims. Specifically, it argues that it is entitled to "an affirmative defense called the 'bona fide error' defense, which insulates [debt collectors] from liability even when they have failed to comply with the Act's requirements." Edwards v. Niagara Credit Solutions, Inc., 584 F.3d 1350, 1352 (11th Cir. 2009). "The defense is found in 15 U.S.C. § 1692k(c), which provides:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error."

Edwards, 584 F.3d at 1352. "A debt collector asserting the bona fide error defense must show by a preponderance of the evidence that its violation of the Act: (1) was not intentional; (2) was a bona fide error; and (3)

occurred despite the maintenance of procedures reasonably adapted to avoid any such error." Id. at 1352-53. "The failure to meet any one of those requirements is fatal to the defense." Id. 1353.

It is unclear whether the record evidence establishes that Wells Fargo is entitled to the "bona fide error" defense. Indeed, at oral argument, Wells Fargo's counsel struggled to explain how the court could conclude, at this stage of the litigation, that the apparent errors in her client's communications to Avery "occurred despite the maintenance of procedures reasonably adapted to avoid any such error[s]."

Given the fact that these and other issues related to Avery's FDCPA claims were not fully briefed before the bankruptcy court and given this court's conclusion that the bankruptcy court's sua sponte grant of summary judgment was both unclear and (relatedly) improper, the

32

grant of summary judgment on the FDCPA claima will be reversed.[19]

\*\*\*

For the foregoing reasons, the decision of the bankruptcy court will be affirmed in part and reversed in part. Specifically, the bankruptcy court's decision regarding false default and wrongful foreclosure will be affirmed. However, the bankruptcy court's decision regarding the imposition of improper fees and violations of the FDCPA will be reversed. An appropriate judgment remanding the case for further proceedings consistent with this opinion will be entered.

DONE, this the 22nd day of July, 2010.

_/s/ Myron H. Thompson_
UNITED STATES DISTRICT JUDGE

---

19. Among the other issues is whether the bankruptcy court can properly exercise jurisdiction over Avery's FDCPA claims. <u>See, e.g.</u>, Appellant's Br. at 48-53; Appellee's Br. at 26. This issue should be addressed, in the first instance, by the bankruptcy court.